(No. 18489.—Decree reversed.)
FLAUDIA M. ABEL, Appellee, *vs.* RUTH VIRGINIA SCHUETT,
Appellant.

*Opinion filed February 24, 1928—Rehearing denied April 5, 1928.*

1. DEEDS—*intention controls in determining delivery of deed.* While delivery is essential to make a deed valid, delivery is not accomplished by any particular method or ceremony, and the real test in all cases is the intent with which the act or acts were done which are relied upon as a substitute for actual delivery.

2. SAME—*when a deed of voluntary settlement is presumed to have been delivered.* The law presumes more strongly in favor of delivery of a deed of voluntary settlement than in case of bargain and sale, and such a deed will be presumed to have been delivered so as to vest title in the grantee although it is retained by the grantors until their death, especially where the deed reserves a life estate in the grantors and where other circumstances do not show an intention contrary to that expressed on the face of the deed, as the grantors' intention in such case is of greater importance than the actual or manual possession of the instrument itself.

3. SAME—*when reservation of "absolute title" during life of grantors does not render deed inoperative.* In a deed of voluntary settlement a reservation in the grantors of "the absolute title, use, control and income of said premises during the life of them and the survivor of them" does not render the deed inoperative where it is clear that the title to the land was not reserved or intended to be reserved, the reservation being of the title or right to the use, control and income during the life of the grantors, only.

APPEAL from the Circuit Court of Macon county; the Hon. JAMES S. BALDWIN, Judge, presiding.

VAIL, POGUE & ALLEN, for appellant.

REDMON & REDMON, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

Flaudia M. Abel (hereafter referred to as appellee) filed her bill in the circuit court of Macon county to the October term, 1926, seeking to set aside and cancel as a cloud

upon her title a certain deed executed and acknowledged by her father and mother on November 27, 1912, conveying to appellee and "the heirs of her body" 160 acres of land in Macon county. The consideration recited in the deed was love and affection and the sum of one dollar, and it also contained the following provisions: "Reserving to the said grantors and to the survivor of them, the absolute title, use, control, and income of said premises, during the life of them and the survivor of them. * * * In case said Flaudia M. Abel shall leave no heir or heirs of her body her surviving, the said premises are upon her death to revert to the heirs of the said grantor, A. C. Traughber, as if he had died intestate at the date of her death." Appellee's father died intestate in July, 1913, and the deed here involved, together with four other deeds to be hereafter mentioned, were thereafter found in his safety deposit box in a bank in Decatur, Illinois. Appellee acquiesced in having said deed recorded January 18, 1922, at which time three other deeds to each of her three brothers were also placed on record. During December, 1924, appellee secured a quit-claim deed from her mother and her three brothers and their respective spouses to the 160 acres in question, and has since contended that the recorded deed of 1912 was never delivered, and that she owns title in fee to the property by descent from her father and by virtue of the 1924 quit-claim deed from her mother and her three brothers, who, with herself, were her deceased father's only heirs-at-law. The chancellor approved the report of the master in chancery to whom the cause was referred to take the evidence and report his conclusions of law and fact, found the deed had not been delivered, and entered a decree declaring it null and void and removing the same as a cloud upon appellee's title. The decree further recites that appellee is the present owner in fee of the 160 acres in question. From that decree Ruth Abel Schuett, the daughter and only child of appellee, has prosecuted an appeal to this court.

The following facts were developed upon the hearing of the cause: A. C. Traughber in 1904 owned about 800 acres of land in Macon county and lived on a part of it near Mt. Zion. His immediate household consisted of his wife and daughter and the latter's infant child. The daughter had been divorced from her husband and had returned to the home of her parents, where she continued to reside with her mother for some time after her father's death, and then with her mother moved to the city of Decatur, where they now live. Traughber also had three married sons, George, Judd and Bert, all of whom maintained separate dwelling places and farmed different parts of the father's land. One son paid grain rent for the use of the land and the other two paid no rent whatever. During the latter part of 1904 the father on one or more occasions discussed with his four children his intention of dividing his farm property so that each child would receive 200 acres of land. They were told as to what property each was to receive, and that each. child would have to pay the taxes on the land he received and two dollars an acre rent to the father and mother as long as either of them lived. Each child assented to the proposal and was fully satisfied with the division of the land. Accordingly, at the father's request, the parents and children met at a lawyer's office in Decatur on November 7, 1904, where, by the father's direction, the attorney prepared four deeds, conveying to each of the children 200 acres of land. The land conveyed to at least one of the sons was not identical with that which he had been previously farming. The four deeds were executed by the parents in the presence of the four children, and it appears that one deed was perhaps read aloud, after which the father took possession of the instruments. None of the deeds were recorded during the father's lifetime, but three of them to the three boys were found after the father's decease in his bank safety deposit box. Two of the deeds executed in 1904 were introduced in evidence and showed they were acknowledged

four days after being executed. The third deed of 1904, being the one devising 200 acres of land to the son Bert, had disappeared before the time of this hearing. No one seems to know, or at least the record does not disclose, what became of the fourth deed, supposedly made on the same date to appellee. The four children and their mother, all of whom testified on the hearing, have practically no recollection of any conversation or of other details which occurred on November 7, 1904, at the lawyer's office when the four deeds were prepared and executed. The attorney who drafted them has been dead for several years. Each of these deeds conveyed 200 acres to a child of the grantors and the heirs of its body. A life estate was reserved to the father and mother and the survivor of them, and there was a reverter clause if any grantee died leaving no issue him surviving. These last clauses were almost identical with the language used in the clauses of the 1912 deed here involved and previously quoted from in this opinion. The deeds to the boys also provided, in the case of a reverter, for the use of one-third of the land by their respective widows under certain restrictions.

Upon the execution of the deeds of 1904 Traughber's four children took possession of the respective lands deeded to them, paid the taxes thereon each year, paid two dollars an acre rent to the father until his death and thereafter a like sum to the mother. The boys, at least, after 1904 considered they owned the respective lands of which they were placed in possession and neither claimed any interest in the lands of any other child. The mother was also of opinion the property had been divided among the children, regarded it as their property, and that the land would finally go to her grandchildren. While appellee was living with her parents she requested her father to make a deed to her for 40 acres so that she could sell the same. On November 27, 1912, two deeds were executed and acknowl-

edged before the same officer by appellee's parents.  One instrument conveyed 40 acres in fee to appellee but reserved a life estate to the parents or the survivor of them.  The other deed conveyed 160 acres to appellee "and the heirs of her body," and is the deed she now seeks to set aside as a cloud upon her title.  It contained provisions reserving a life estate to her parents and a reverter clause, as heretofore stated.  These two deeds, as we understand the record, comprised the same lands originally set off to appellee by her father in 1904, and were included in the deed of that year supposedly made to her by her parents in furtherance of the proposed division by her father of his 800 acres of farm land.  Appellee testified she did not remember being present when the two deeds were executed and acknowledged by her parents conveying the 40-acre and the 160-acre tracts of land to her, neither did she remember seeing the deed for the 40 acres before her father's death, in July, 1913, and supposed she obtained that deed from her father's safety deposit box.  She stated positively she never saw the deed here involved for the 160 acres until "I had it recorded," which was on January 18, 1922, at which time she took it from the safety deposit box.  From the testimony of appellee it would appear that she also found the 40-acre deed in the safety deposit box after her father's death.  Neither of these deeds had been recorded by the father, nor, according to appellee's testimony, had actual possession of the instruments been delivered to her.  The evidence in the record tends to establish that no one had access to the father's safety deposit box during his lifetime except himself; that after his death his widow had the key thereto, and appellee only had access to the box after her mother's eyesight failed, some five or more years prior to this hearing.

On September 17, 1913, a little over two months after her father's death, appellee sold the 40-acre tract previously mentioned to Mary A. Dunn.  At the same time she obtained a quit-claim deed to the property from her mother,

thereby releasing the life estate reserved to the mother, who was one of the grantors in the deed of 1912 conveying the 40 acres to appellee. Evidently some question must have been raised by the purchaser of this 40 acres relative to the delivery of the deed thereto from the grantors to appellee. This record contains two affidavits relative to the deed, which bear date of September 23, 1913, but which were not filed for record until after the master's report was made in this. suit and just prior to the hearing of exceptions thereto before the chancellor. Copies of the affidavits were made a part of this record. One was executed by appellee, wherein she states, in substance, that she was present when the deed was executed; that immediately after its execution, upon the same day, possession thereof was given to her, with privilege to file it for record or keep it, as she saw fit. She further stated in the affidavit that she placed it with other papers in a box which her father kept in the Millikin National Bank until September 17, 1913, at which time she had the same recorded for the reason that she was then selling the premises. The contents of that affidavit were substantiated by the second affidavit, which was made by her mother, who was one of the grantors in the original deed in question. It will thus be seen that the contents of the affidavit executed by appellee do not coincide with the testimony given by her on the trial of this cause relative to the making of the deed to the 40 acres to her in 1912 by her father or as to the delivery of the instrument into her possession.

During August, 1914, following the death of appellee's father, there was an inheritance tax proceeding in 'the county court of Macon county relative to the determination of inheritance taxes to be charged against the estate of A. C. Traughber. The petition filed in the county court made all the grandchildren of Traughber parties, and appellee appeared as the mother and next friend of appellant, who was then a minor. As a result of this proceed-

ing appellee paid an inheritance tax upon the property she received from her father's estate, and the testimony of the attorneys representing the mother and the children of Traughber, as well as that of the inheritance tax attorney representing the State, shows that the deeds executed by Traughber in his lifetime were used as a basis for fixing the inheritance tax in that estate. The deeds submitted to the attorneys were considered by all persons interested, as well as by the court, as a disposition by the decedent of his estate during his lifetime. The attorney for the parties interested in the estate testified that he talked with all the members of the family respecting the inheritance taxes. Though the testimony of appellee and her mother tends to show that none of the deeds' which were in the father's safety deposit box were removed therefrom or shown to anyone, yet the attorneys in the inheritance tax proceeding testified that the deeds showing the children's interests were exhibited to them and given into their possession. During this proceeding it was discovered by someone that the deed which had been found in the father's box and conveying to the son Bert a 200-acre tract of land located the land in the wrong range. This original deed was taken from the safety deposit box by appellee and delivered to her brother Bert, who had a new quit-claim deed prepared, which was dated March 31, 1915. The language of this deed was almost identical with the provisions in the other deeds made by the grantors in 1904, and was executed by the mother, the two brothers and appellee. The purpose was to give to Bert the same kind of title which the other children had received. The old deed to Bert, of 1904, disappeared and the new one was placed in the same safety deposit box in the Millikin National Bank. On January 18, 1922, the original deeds of 1904 made to two of the sons, Judd and George, the deed made by the widow and the two brothers and appellee to Bert, which was dated March 31, 1915, and made to correct the mistake in his original deed, and

the deed for 160 acres of land made in 1912 to appellee, which is the instrument involved in this cause, were taken from the safety deposit box by appellee, delivered to her brother Judd and placed on record. Some time later one of the sons brought a suit to set aside some of the deeds in question, but this suit was later dismissed. Prior to the bringing of that suit, upon the advice of a lawyer, the children in 1924 executed and exchanged quit-claim deeds conveying to each the same lands originally conveyed to him or her by the father and mother and of which said child was then in possession. Each brother then received a quit-claim deed for 200 acres and appellee's deed was for 160 acres.

There was no testimony in the record by any witness except appellee that the deed made in 1912 conveying the 160 acres to her was not delivered. The brothers evidently knew nothing about the transaction, and her mother could not remember whether the daughter asked her parents to make the deed for 40 acres to her, but stated "the business was fixed" so the daughter could sell the 40 acres. In fact, there was no direct denial by appellee that the two deeds were not made in her presence and at the same time in 1912, one deed conveying to her the 40 acres which she sold two months after her father's death, and the 160-acre deed she now seeks to have canceled. Appellee would not say that such did not actually occur, but replied, "I don't remember."

It is not necessary to discuss at length the law applicable to a case of this kind. Many cases have established the rule that a delivery is necessary to make a deed valid. However, a delivery is not accomplished by any particular method or ceremony. The real test in all cases is the intent with which the act or acts relied upon as a substitute for actual delivery was done. In the case of a deed which is a voluntary settlement the law presumes more strongly in favor of a delivery than it does in the usual case of bargain and sale.

In ascertaining whether or not a voluntary settlement deed has been delivered, the grantor's intention to vest title in the grantee is of greater importance than the mere actual or manual possession of the instrument itself. Such a deed may be effective to vest title in the grantee although retained by the grantor in his possession until his death if other circumstances do not show an intention contrary to that expressed on the face of the deed. (*Riegel* v. *Riegel,* 243 Ill. 626.) The deeds of 1904 to all the children, the two made in 1912 to appellee and the one made in 1915 to Bert, reserved a life estate in favor of the original grantors (the parents) or the survivor of them. The reservation in a deed of a life estate in the grantor raises a strong presumption that the intention is that title should vest at once and the conveyance become immediately operative. There would be no purpose in making such reservation if the conveyance were not to become effective until after the grantor's death. (*Riegel* v. *Riegel, supra; Baker* v. *Hall,* 214 Ill. 364.) It has been said that where a grantor has reserved a life estate in land conveyed by him, he is as much entitled to the custody of the deed as the grantee. (*Humphreys* v. *Humphreys,* 300 Ill. 46.) A fair consideration of the facts here presented can result only in the conclusion that a voluntary family settlement was contemplated and entered into by A. C. Traughber, his wife and the four children in 1904. All parties were satisfied with the father's proposed division of his land, and deeds were accordingly made reserving a life estate in the grantors. Each child took possession of the respective lands agreed upon in the division, paid taxes thereon continuously and paid rent to the grantors. For a period of more than twenty years, both during the father's lifetime and thereafter, all members of the Traughber family recognized the settlement and division of the property. No dower was set off to the mother after the father's death and the same rent was paid thereafter to the mother. The recognition by appellee of the

life estates reserved in the deed to her father and mother or the survivor of them would seem to require her to also appreciate the provisions of the same deed wherein she received a life estate with remainder to her daughter, appellant. Following the father's death, and after appellee had sold the 40 acres, which were a part of her original allotment of 200 acres, the widow and all the children must have claimed under the deeds previously executed and acknowledged by the father and mother and then found in the father's bank safety deposit box, because inheritance taxes were assessed and thereafter paid by the widow and appellee, using those deeds as a basis of such settlement. At that particular date appellee's deed for 160 acres, which is here involved, was unquestionably in the bank box and was used in that proceeding, wherein appellee appeared for and represented appellant, as the latter's mother and next friend. Her appearance in such capacity was entirely unnecessary unless the grandchild had some interest, as now claimed by her, under the deed of 1912 to her mother. The position of the members of the Traughber family as to there having been a complete voluntary settlement is further disclosed by the new deed made in 1915 to Bert, one of the sons of the original grantors, whereby the description in his earlier deed of 1904 was corrected and his title made the same and with like restrictions as that already conveyed to the other children. Without question appellee knew in 1922 whether or not the deed here involved had been delivered to her and was the instrument under which she claimed title, otherwise she would not have consented to having it recorded at that time. The record contains nothing whatever to refute the existence of a voluntary family settlement in 1904, with positive intent on the part of the father and mother that the deeds then executed should become immediately operative and effective, except that the same grantors executed two deeds to appellee eight years later. The deed to appellee made in 1904 disappeared. Had it

been found or were it in existence we think there would be little controversy as to it having been delivered. The proof unquestionably establishes that the two deeds made in 1912 were merely in substitution of the former division or share of 200 acres to appellee, and at least one of these deeds, that for the 40-acre tract, was procured from the grantors at the special instance and request of appellee so that she might sell that land. The delivery of that deed was then claimed by appellee so that she might profit therefrom, and the delivery of the other deed for 160 acres is now denied by her so that she might also profit by such position. The surrounding circumstances and the activities of all parties interested in Traughber's estate point to the delivery of the deed here in question. Appellee's present testimony and the affidavits concerning the delivery of the deed to the 40-acre tract are in conflict. That state of the record, coupled with her convenient lack of memory on other important points, justifies the conclusion that her testimony is not sufficient to warrant holding that the 160-acre deed of 1912 was not delivered. Every presumption is in favor of the delivery of both deeds executed by appellee's parents in 1912 and comprising the same number of acres and description of land as agreed upon in the original voluntary settlement of 1904.

The deeds from the father and mother in 1904 and 1912 reserved to the grantors "the absolute title, use, control and income" during the life of the grantors or the survivor of them, and appellee seemingly questions the effect of the deed reserving the absolute title. Appellee's position in the court below was not that the clause mentioned made the deed inoperative, but her contention was the deed to the 160 acres was never delivered. Aside from the fact that the point does not appear to have been raised in the court below, it seems clear the title to the land was not reserved or intended to be reserved. The reservation was of

title or right to the use, control and income during the life of the grantors.

In view of our conclusion on the question of delivery of the deed it is unnecessary to further discuss other points made by appellant's counsel.

The decree of the circuit court is therefore reversed.

*Decree reversed.*